IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BARBARA ANNE EARLE,

Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

CIVIL ACTION NO. 9:15-1540-SB-BM

**REPORT AND RECOMMENDATION**

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on June 28, 2012, alleging disability beginning November 7, 2010, due to a dislocated disc in her back that causes her pain "all over". (R.pp. 10, 91, 115, 121). Plaintiff's alleged onset date of disability was later amended to September 30, 2012. (R.pp. 10, 21). Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on October 29, 2013. (R.pp. 19-42). The ALJ thereafter denied Plaintiff's claim in a decision issued January 17, 2014. (R.pp. 10-18). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).



Plaintiff then filed this action in United States District Court. Plaintiff asserts that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for an award of benefits or, alternatively, for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

**Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).



**Discussion**

A review of the record shows that Plaintiff, who was fifty-five (55) years old when she alleges she became disabled, has a high school education and has past relevant work experience as a data entry clerk. (R.pp. 17, 23, 25, 91, 116). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairment[1] of degenerative disc disease (DDD) (R.p. 12), she nevertheless retained the residual functional capacity (RFC) to perform sedentary work[2] with limitations of lifting/carrying 10 pounds occasionally and less than ten pounds frequently; standing and sitting up to six hours (each) in an eight-hour workday; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; unlimited balancing; occasional stooping, kneeling, crouching, and crawling; and no overhead reaching bilaterally (with unlimited reaching in other directions). (R.p. 14). Then, at step four, the ALJ found that Plaintiff was not disabled because

---

[1]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[2]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).



she was capable of performing her past relevant work as a data entry clerk both as it is performed actually and as generally performed in the economy. (R.p. 17-18).

Plaintiff asserts that in reaching this decision, the ALJ erred because she failed to give appropriate weight to Plaintiff's treating source providers and failed to make the necessary credibility findings. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

**Medical Records**

On May 20, 2010 (several months before Plaintiff's original, and more than two years prior to her amended, alleged onset date of disability), x-rays of Plaintiff's left shoulder showed soft tissue calcification compatible with calcific tendonitis, but with no fracture, dislocation, or destructive process. (R.p. 190). That same day, x-rays of Plaintiff's cervical spine showed DDD and spondylosis primarily at C5, C6, and C7. (R.p. 191). Thereafter, on June 10, 2010, Dr. Thomas D. Armsey, II, an orthopedist at Midlands Orthopaedics, examined Plaintiff for complaints of bilateral shoulder, neck, and low back pain without radiation to her lower extremities or persistent numbness or weakness. Although Plaintiff complained of "daily" low back pain, she had "full" muscle strength in her cervical spine. (R.pp. 161-163). Dr. T. Daniel Silvester, a radiologist, noted that a cervical spine MRI study taken that day indicated there was no significant spinal canal or neural foraminal stenosis, and no spinal cord or spinal canal nerve root impingement. (R.p. 188). Dr. Armsey stated that Plaintiff had only "mild" disc space narrowing. (R.p. 162).



On June 24, 2010, Plaintiff complained to Dr. Armsey of numbness and tingling in her bilateral upper extremities. He noted that the MRI of her cervical spine revealed C3-C7 mild posterior osteophyte complex without central or foraminal stenosis, no disc herniations, and no bone edema. (R.pp. 163-165). An EMG of Plaintiff's bilateral upper extremities on July 14, 2010, revealed only very mild right carpal tunnel syndrome, no sign of left carpal tunnel syndrome, and no evidence of left or right cervical radiculopathy. (R.pp. 166-167). On July 27, 2010, Dr. Armsey noted that Plaintiff was still complaining of pain that he could not explain, and that her EMG and other diagnostic studies showed no acute pathology that would explain her pain. (R.pp. 168-169).

On August 10, 2010, Plaintiff complained to Dr. Armsey about cervical, low back, and bilateral shoulder pain. Examination of her lumbar spine revealed only mild paraspinal tenderness, full strength to flexion/extension/rotation/lateral bending, no midline tenderness, and negative straight leg raising test bilaterally. Plaintiff's bilateral lower extremities were neurovascularly intact, her gait was non-antalgic, and there was no atrophy of her bilateral lower extremities. Examination of Plaintiff's cervical spine revealed only mild paraspinal tenderness, with no lesions, erythema, midline tenderness, crepitus, or masses. There was also no atrophy of her bilateral upper extremities, her muscle strength was full, her deep tendon reflexes were full and equal, and her sensation was intact. Dr. Armsey noted that Plaintiff was showing improvement with her recent walking program, and he prescribed a physical therapy program. His assessment was chronic low back pain, obesity, and cervical spine pain-spondylosis. (R.pp. 170-171).

Plaintiff again complained of daily cervical, bilateral shoulder, and low back pain on September 3, 2010. Dr. Armsey noted that x-rays of Plaintiff's lumbar spine showed DDD at L3-L4 with end plate sclerosis, and mild DDD at L4-L5 and L5-S1. He recommended an MRI to rule out



L4 nerve root entrapment. (R.pp. 172-173). A September 2010 MRI of Plaintiff's lumbar spine showed mild DDD of her lumbar spine without any significant compressive sequelae. (R.p. 186). On September 17, 2010, Dr. Armsey noted that the MRI showed mild central canal stenosis and bi-foraminal stenosis at L3-L4, and left-sided disc bulge without stenosis. He planed to administer a diagnostic and therapeutic lumbar epidural steroidal injection (LESI). (R.p. 175).

Dr. Armsey administered a LESI on September 28, 2010. (R.p. 176). On October 5, 2010, Plaintiff reported improvement in her pain and function. Dr. Armsey noted that Plaintiff's neck and back improved with the injection as well as formal physical therapy, that she had started a walking program for weight loss and aerobic fitness, and was motivated to improve her core strength. He opined that, from a functional standpoint, Plaintiff could perform no overhead work or lift in excess of ten pounds. (R.pp. 178-179).

When Plaintiff returned on January 7, 2011, Dr. Armsey noted that she was clinically improving with a home exercise program and intermittent pain medications. (R.p. 180-181). On April 21, 2011, Dr. Armsey noted that Plaintiff was doing well with regard to her neck, back, and, leg pain. He prescribed Ibuprofen, an anti-inflammatory medication. (R.pp. 182-183). During her July 19, 2011 appointment with Dr. Armsey, Plaintiff reported intermittent neck and back pain, but denied radicular pain in her arms and legs, reported she was walking a bit for exercise and had lost four pounds, and that she was performing exercises at home with improvement. (R.pp. 184-185).

At Plaintiff's next appointment with Dr. Armsey on December 9, 2011, she complained of low back pain with occasional right lower leg radiculopathy that was tolerable. Examination revealed that Plaintiff had a normal gait, no limp, 5/5 (full) motor strength, and negative straight leg raise testing. Plaintiff told Dr. Armsey that she was not interested in aggressive



management and wanted to advance her activities as instructed and follow up in three months. (R.pp. 193-194).

Plaintiff was examined on February 21, 2012, by Dr. Vijaya Korrapati, an oncologist, for follow-up of her cutaneous T-cell lymphoma,[3] which Plaintiff had been diagnosed with in 2009. Plaintiff advised that she had been active doing housework, and complained of neck, left shoulder, and arm pain, as well as occasional back pain. Musculoskeletal examination revealed no tenderness or swelling and normal range of motion without obvious weakness. She had a stable rash to her legs and abdomen with a some new rash on her upper extremities. (R.pp. 343-345). On May 22, 2012, Dr. Korrapati noted that Plaintiff's lab work looked good, that an appointment would be made with a physician's assistant in dermatology to evaluate her arm lesions, and that she was to return in six months. (R.pp. 339-342).

In March 2012, Plaintiff reported to Dr. Armsey that her pain (which she described as 6/10) was being alleviated with medication that was "helping a lot". She ambulated with a normal gait, her range of motion was normal, her motor strength was 5/5, and straight leg raise testing was negative. (R.pp. 195-197). On April 12, 2012, Plaintiff was referred to Dr. Ivan E. Lamotta, an orthopedic surgeon also with Midlands Orthopaedics, to discuss surgical options because she had not responded to conservative management. Plaintiff complained of low back pain that had persisted for over a year, described her pain as moderate, and denied any radicular symptoms. Physical

[3]Cutaneous T-cell lymphoma, a rare type of cancer that begins in the white blood cells and attacks the skin, is one of several types of lymphoma collectively called non-Hodgkin lymphoma. Cutaneous T-cell lymphoma can cause rash-like skin redness and, sometimes, skin tumors. Treatments can include skin creams, light therapy, medications and radiation therapy." Mayo Clinic, Patient Care and Health Information, Diseases & Conditions, Cutaneous T-cell Lymphoma, Overview, http://www.mayoclinic.org/diseases-conditions/cutaneous-t-cell-lymphoma/home/ovc-20179742 (last visited Mar. 7, 2016).



examination revealed a normal gait, 5/5 motor strength, and negative straight leg raise testing. Dr. Lamotta recommended an updated MRI. (R.pp. 198-201). An April 19, 2012 MRI of Plaintiff's lumbar spine showed disc space loss and mild disc bulging at L3-L4. (R.pp. 211-212, 243-244). On May 3, 2012, Plaintiff reported 8/10 pain in her back and 4-7/10 in her right leg (posterior), but also stated that her medication (Lortab) was helping a lot. Even so, Dr. Lamotta opined that conservative management had been unsuccessful in controlling Plaintiff's symptoms. (R.pp. 202-205).

At her May 2012 appointment with Dr. Korrapati, it was noted that Plaintiff's lab work looked good, and that her last CT scans in December 2011 had showed no lymphadenopathy.[4] Plaintiff reported that she had occasional pain to her left upper quadrant, especially when lifting heavy objects, but that she had had this problem in the past and it resolved on its own. She also reported an increase in lesions on her bilateral upper extremities. Dr. Korrapati referred Plaintiff to dermatology to evaluate her arm lesions and instructed her to return in six months. (R.pp. 339-342).

At Dr. Lamotta's recommendation, a lumbar discography was performed on May 25, 2012, and it showed findings consistent with Plaintiff's typical pain at the L3-L4 level. It was also noted that there was narrowing, degeneration, and fissuring at this disc space. (R.pp. 241-242). On June 28, 2012, Dr. Lamotta recommended Plaintiff undergo a lateral interbody fusion at L3-L4, but Plaintiff stated that she did not feel quite ready for surgery and wanted to think about it. (R.pp. 206-209).

---

[4]On December 2, 2011, a CT of Plaintiff's abdomen and pelvis showed no tumor recurrence, while a CT of her neck showed one lymph node on the left that was slightly larger than the others, but within normal range. (R.pp. 346-347).



On August 6, 2012, state agency physician Dr. Hugh Wilson completed a physical RFC assessment and opined that Plaintiff had the RFC for light work[5] and could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of about six hours and sit for a total of six hours in an eight-hour workday; push and/or pull without limitation except as shown for lifting and/or carrying; could occasionally climb ramps/stairs, stoop, kneel, crouch, or crawl; had unlimited ability to balance; could never climb ladders/ropes/scaffolds; and had no manipulative, visual, communicative, or environmental limitations. (R.pp. 43-47).

Plaintiff was examined by Dr. Tanya Seawright, a primary care physician, for complaints of back pain on August 21, 2012. Plaintiff reported that she was filing for disability; was scheduled for a LESI later in the week, was considering back surgery, and needed to decide whether to pursue surgery as she had been denied disability benefits two weeks earlier, had not worked since 2010, and had been receiving unemployment benefits for two years that were due to end that week. (R.p. 427). Thereafter, Dr. Guillermo E. Pineda, a cardiologist, saw Plaintiff on August 28, 2012, at which time Plaintiff reported that she was able to perform her day-to-day physical activities around the house with no limitations. Dr. Pineda opined that Plaintiff was stable from a cardiovascular standpoint. (R.pp. 237-240).

As previously noted, Plaintiff does not herself contend that her impairment was of a disabling severity during the period of time covered by the medical records cited and discussed hereinabove. (R.pp. 10, 21). Therefore, in order to obtain DIB, Plaintiff must have evidence to show

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).



that her condition significantly worsened after September 30, 2012 (her alleged disability onset date) from what it had been as shown by these medical records. Orrick v Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

The record reflects that Dr. Ellen Humphries, a state agency medical consultant, completed a physical RFC assessment on October 11, 2012 (which was now after Plaintiff alleges her condition had become disabling), in which she opined that Plaintiff had the same limitations (i.e., that Plaintiff was capable of performing a range of light work) as was previously assessed by Dr. Wilson. (R.pp. 53-55, see R.p. 46). On December 13, 2012, Dr. Lamotta noted that although Plaintiff was reporting pain at a level of 9 on a 10 point scale,[6] on examination she had a normal gait, no limp, and was ambulating without the need of assistive devices. (R.p. 435). She also had full (5/5) motor strength and essentially normal ranges of motion. (R.p. 436). An anterior lumbar interbody fusion was recommended and discussed, but not scheduled. (R.p. 437).

At an appointment prior to her February 2013 colonoscopy, Plaintiff denied back pain, arthralgias, stiffness, and myalgias. (R.pp. 320-322). When Plaintiff returned on April 11, 2013, Dr. Lamotta noted that surgery had not been approved by Plaintiff's insurance company, that she would proceed to obtain a second surgical opinion, and that she "may" be a candidate for surgery in the future. (R.pp. 431-433). On examination Dr. Lamotta found that Plaintiff had only mildly limited range of motion in her spine, that she ambulated without need of any assistive devices, that her lower

---

[6] Morris v. Barnhart, No. 03–1332, 2003 WL 22436040, at *4 (3d Cir. Oct.28, 2003) ["the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."].



extremity strength was full (5/5) and had no deficits, and that she had intact sensation in all major dermatomes. (R.p. 434).

Plaintiff returned to Dr. Korrapati in May 2013, and reported feeling well overall, except for slight fatigue and pain in her lower back. Plaintiff's rashes were noted to be stable and her labs looked good. The plan was to monitor Plaintiff clinically with no indication that a CT scan was needed at that time. (R.pp. 334-337). On June 19, 2013, Dr. Steven C. Poletti of Southeastern Spine Institute recommended that Plaintiff undergo interbody fusion. Plaintiff said she would follow up with Dr. Lamotta for surgical approval. (R.p. 402).

On June 21, 2013, Dr. Seawright performed a well adult examination. Plaintiff described her general health as good, and Dr. Seawright noted that Plaintiff was stable on her current diabetes medications without complications and that she was tolerating her cholesterol medications well. Examination revealed that Plaintiff had a supple and non-tender neck, no carotid bruit or thryromegaly, normal range of motion, a normal gait, and normal sensation. (R.pp. 404-407).

On June 27, 2013, Plaintiff returned to Dr. Lamotta with complaints of lower back pain. Examination revealed mildly limited range of motion, an ability to ambulate without an assistive device, no deficits in Plaintiff's lower extremity strength (5/5), and intact sensation in all dermatones. Dr. Lamotta noted he would seek surgical approval from Plaintiff's insurance company for surgery ( L3-L4 interbody fusion). (R.pp. 428-430).

**I.**

**(Treating Sources/RFC)**

Plaintiff initially argues that the ALJ's RFC determination that she could perform a range of sedentary work is not supported by substantial evidence, in particular that the ALJ failed to



give appropriate weight to the opinion of her treating source providers. Plaintiff's argument is essentially that the ALJ should not have given great weight to treating orthopedist Dr. Armsey's October 2010 opinion, and should instead have given greater weight to later evidence indicating a worsening in her condition. See (R.p. 17).

Plaintiff argues that Dr. Armsey's October 2010 opinion was based on only on the diagnoses that had been made at that time ( bilateral upper extremity radiculopathy, cervical spinal pain with spondylosis, and chronic back pain) and objective medical evidence which included x-rays and MRI of her cervical spine that showed mild DDD and a lumbar MRI that revealed mild DDD without an significant compressive sequelae identified, but that by 2012 her diagnoses included lumbago, spinal stenosis, disc degeneration, sciatica, and cervicaligia, while an April 2012 MRI indicated a worsening of her lumbar condition including disc space loss and bulging at L3-4. Plaintiff asserts that she has moderate to severe osteoarthritis in her lumbar and cervical spine with pain radiating to her upper and lower extremities which precludes her from performing sedentary work, and that the ALJ erred in finding that she had the RFC to perform a range of sedentary work.

RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" Id. at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to



perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).

Here, however, the ALJ properly evaluated Plaintiff's RFC by including in her decision a narrative discussion of the medical and nonmedical evidence to conclude that Plaintiff had the RFC to perform a range of sedentary work.  (R.pp. 14-17). The ALJ specifically stated that the RFC:

> assessment is supported by the overall record which shows that while [Plaintiff] does have [DDD] confirmed by diagnostic testing, there are only mild clinical findings and the only limitations given are for no overhead work and no lifting more than 10 pounds, which is consistent with the determination that she is able to lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand 6 hours of an 8 hour workday, and sit 6 hours of an 8 hour workday; and no overhead reaching bilaterally with unlimited reaching in other directions.  Additionally, [the ALJ also] determined that the overall record supports the additional limitations of no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, unlimited balancing, and occasional stooping, kneeling, crouching, and crawling.

(R.p. 17).

Objective medical evidence supports the ALJ's conclusion that although Plaintiff's DDD limited her to sedentary work, her combination of severe and non-severe impairments did not prevent her from performing all work.

Plaintiff's June 2010 cervical spine MRI revealed minimal to mild posterior disc/osteophyte formation at C3-4 through C6-7 without any spinal canal or neural foraminal stenosis and no spinal cord or spinal nerve root impingement, and nerve conduction studies in July 2010 showed no left or right cervical radiculopathy.  (R.pp. 15, 166-167, 188).  A lumbar spine MRI in September 2010 showed only mild degenerative disc disease without significant compressive



sequelae. At L3-4 there was mild symmetrical diffuse disc bulge, mild central stenosis, and mild bilateral foraminal stenosis; at L4-5 there was a diffuse disc bulge slightly asymmetric to the left, mild left and no significant right foraminal stenosis, no significant central canal stenosis, and mild bilateral facet arthropathy; and at L5-S1 there was mild symmetrical diffuse disc bulge, no significant central stenosis, and no more than mild bilateral foraminal stenosis. (R.pp. 16, 186). Similarly, a lumbar MRI in May 2012 revealed that at L3-4 there was some mild annular disc bulging without significant deformity to the thecal sac, no spinal stenosis, and patent lateral recesses and neural foramina; at L4-5 there was no focal disc deformity and no spinal stenosis; and at L5-S1 there was no focal disc deformity, no spinal stenosis, and only some mild degenerative change involving the facet joints. (R.p.16, 211). Discography was positive for Plaintiff's typical pain at the L3-L4 level. (R.p. 242). Additionally, musculoskeletal examinations consistently indicated normal range of motion, normal gait, full strength, and normal sensory findings. (R.pp. 16-17, 196-197, 194, 344, 406).

These clinical findings extended into Plaintiff's purported period of disability, as in the latest treatment note of record (June 2013 - more than eight months after her amended onset date), clinical findings from Dr. Lamotta indicated that Plaintiff had only mildly limited range of motion, she ambulated without an assistive device, she had no deficits in lower extremity strength, and her sensation was intact. (R.p. 17, 430). See also (R.pp. 404-407, 434-436). These medical records, including records from the specialists in orthopedics and Plaintiff's primary care provider, generally reflect unremarkable physical examinations and routine, conservative care throughout the period covering both before and after Plaintiff's alleged disability onset date. Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) [generally conservative treatment not consistent with allegations of



disability]; see Orrick, 966 F.2d at 370 [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability]. Even though surgery was recommended, the treating and examining physicians did not outline any further limitations on Plaintiff's ability to work. Further, when surgery was recommended in June 2012 (R.p. 209), Plaintiff decided to think about it, and did not seek a second surgical opinion until approximately a year later in June 2013 (R.p. 402). The ALJ's RFC findings are also supported by Plaintiff's report to her cardiologist in August 2012 that she was able to perform her day-to-day physical activities around the house with no limitations, while in June 2013, Plaintiff's general health status was described as "good". (R.pp. 16, 237, 404).

Hence, the ALJ's decision to give great weight to the 2010 opinion of treating orthopedist Dr. Armsey (that Plaintiff was limited to no overhead work and no lifting more than ten pounds) is supported by substantial evidence, as it is consistent with the overall evidence of record from throughout the relevant time period. See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; see also SSR 96-2p. Under the regulations, a treating source's opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. See also 20 C.F.R. § § 404.1527(c)(2) and 416.927(c)(2). Although Plaintiff appears to argue that the ALJ was precluded from relying on Dr. Armsey's opinion because it was from prior to her amended alleged onset date of disability, she fails to show any error where the ALJ considered both the evidence prior to and after her alleged onset date in reaching her conclusion. See Puterbaugh v. Colvin, 2013 WL 3989581, at *15 (S.D.Ohio Aug. 2, 2013)["The Court is unaware of, and Plaintiff has not cited to,

any rule, regulation, or case prohibiting an ALJ from considering evidence in the record simply because it is from prior to an alleged disability onset date." ], adopted by 2013 WL 4457364 (S.D. Ohio Aug. 20, 2013); see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].

Additionally, the ALJ's determination that Plaintiff could perform a reduced range of sedentary work is also supported by the opinions of the state agency physicians, who actually found that Plaintiff could perform a higher level of light work.  See Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005)[ALJ can give significant weight to opinion of medical expert who has thoroughly reviewed the record]; 20 C.F.R. §§ 404.1527(e); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) ["Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."].  Indeed, it is readily apparent that the ALJ gave Plaintiff every benefit of the doubt in determining her RFC by giving greater weight to the opinion of Plaintiff's treating orthopedist, who assigned more limitations to her, while giving little weight to the opinions of the state agency physicians who had opined that Plaintiff could function at higher level of work activity.  See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; see also Siler v. Colvin, No. 11-303, 2014 WL 4160009 at * 5 (M.D.N.C. Aug. 19, 2014) [Same]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided].



In sum, after careful review of the record, the undersigned can find no reversible error in the ALJ's treatment of the findings of Plaintiff's treating sources or as to her RFC findings. The ALJ did not rely solely on evidence from prior to Plaintiff's amended onset date (including Dr. Armsey's October 2010 opinion) in finding that Plaintiff was not disabled, but considered all of the medical evidence of record from both prior to and after that date. Additionally, Dr. Armsey, as well as an orthopedic surgeon in the same practice (Dr. Lamotta), continued to treat Plaintiff thereafter (including after Plaintiff's amended onset date), and the ALJ properly noted that no additional or greater limitations were placed on Plaintiff by her treating orthopedist or by any other evaluating orthopedist. (R.p. 17). Further, no treating physician determined that Plaintiff was disabled. (R.p. 17). See Poling v. Halter, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001)["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"].

The ALJ adequately explained the rationale behind her decision, which is supported by substantial evidence in the case record. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) [". . .What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]. While Plaintiff obviously believes the ALJ should have reached a different conclusion, this Court cannot substitute its own judgment for that of the ALJ just because there may be conflicting evidence. See Johnson, 434 F.3d at 653 ["In reviewing for substantial evidence, we do not undertake to itself reweigh conflicting evidence."]; Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001)[holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency]; Kellough v. Heckler, 785 F.2d



1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]; Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996)["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]. Therefore, this claim is without merit.

**II.**

**(Credibility)**

Plaintiff also asserts that the ALJ erred in failing to properly analyze her credibility. She argues that her testimony that her lumbar problem kept her "from doing a lot of stuff because I'm not able to sit this long, use my hands regularly...It's just really uncomfortable for me to work because I'm in such pain–severe pain most of the time" (R.p. 29), as well as her reports to physicians that medications and changing positions were the only ways she could alleviate the pain, support her credibility. Plaintiff also contends that opinions of her physicians that she had a "dynamic instability at the level of L3-L4" and had "failed extensive conservative care in the form of medication, physical therapy and epidural steroid injections" support her testimony as credible.

However, while concluding that Plaintiff did have medically determinable impairments that could reasonably be expected to cause the symptoms she alleged, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent inconsistent with the RFC set forth in the decision. (R.p. 15). In reaching this conclusion, the ALJ discussed and evaluated both the medical records and Plaintiff's testimony. (R.pp. 14-17). That is exactly what the ALJ is supposed to have done; see SSR 96–7p, 1996 WL 374186, at *2 [Where a claimant seeks to rely on subjective evidence to prove the severity



of her symptoms, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record."]; Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. Further, when objective evidence conflicts with a claimant's subjective statements, an ALJ is allowed to give the statements less weight; see SSR 96–7p, 1996 WL 374186, at *1; Craig, 76 F.3d at 595 ["Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment."]; and after a review of the record and evidence in this case, the undersigned can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. Ables v. Astrue, No. 10–3203, 2012 WL 967355, at *11 (D.S.C. Mar. 21, 2012) ["Factors in evaluating the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant."](citing SSR 96-7p); Bowen, 482 U.S. at 146 [Plaintiff has the burden to show that he has a disabling impairment]; Jolley v. Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976)[finding that the objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled].

In finding that the medical evidence and Plaintiff's activities of daily living did not support her allegations, the ALJ noted that Plaintiff's treating orthopedist (Dr. Armsey) wrote in July 2010 that the extent of pain complained of was "unexplained" because Plaintiff's nerve conduction and other diagnostic studies revealed no acute pathology to explain Plaintiff's pain. Dr. Armsey only



limited Plaintiff to no overhead work and no lifting more than ten pounds in October 2010. Thereafter, Plaintiff's May 2012 lumbar MRI did not show significant deformity of the thecal sac and showed no spinal stenosis, while her June 2013 clinical findings continued to show only mildly limited range of motion, that she was able to ambulate without an assistive device, and that she had no deficits in lower extremity strength and intact sensation. (R.pp. 15-16). Plaintiff's examinations continued to reveal throughout her period of alleged disability that, notwithstanding her reports of 9/10 pain, she was consistently found to have full (5/5) strength and essentially normal range of motion. (R.pp. 434-436). Cf. Gaskin v. Commissioner of Social Security, 280 Fed.Appx. 472, 477 (6th Cir. 2008)[Finding that evidence of no muscle atrophy and that claimant "possesses normal strength" contradicted Plaintiff's claims of disabling physical impairment].

The ALJ's credibility determination is also supported by Plaintiff's activities of daily living, which included grocery shopping once a week for about thirty minutes, doing laundry once a week, attending church each Sunday, washing dishes, making up her bed, using a microwave to prepare food, and heating up food. (R.pp. 14-15, 27-28); see Johnson v. Barnhart, 434 F.3d at 658 [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d at 178 (4th Cir. 2001).

The ALJ's determination is also supported by Plaintiff's own reports concerning her condition to her medical providers, which indicate that Plaintiff reported improvement with a recent walking program in August 2010; clinical improvement with her home exercise program and intermittent pain medications in January 2011; that she was doing well with regard to her neck, back, and leg pain in April 2011; had only intermittent pain in her neck and back pain without radicular pain



in July 2011; only occasional tolerable right lower leg radiculopathy in December 2011; and that she was not quite ready for fusion surgery in June 2011. (R.pp. 15-16, 171, 181, 183, 185, 194). Plaintiff also reported to her cardiologist in August 2012 that she was able to perform her day-to-day activities around the house with no limitations. (R.p. 15, 237). See 20 C.F.R. § 404.1529(c) [ALJ must consider objective medical evidence]; Parris v. Heckler, 733 F.2d 324, 327 (4th Cir. 1984) ["[S]ubjective evidence . . . cannot take precedence over objective medical evidence or the lack thereof." (citation omitted)]; see also Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989)["The mere fact that working may cause pain or discomfort does not mandate a finding of disability].

Finally, Plaintiff also argues that she should be found credible based on the VE's testimony that, if Plaintiff's assertions as to her limitations were considered to be credible, she would not be able to perform her past relevant work or any other substantial work in the competitive labor market.[7] However, the ALJ specifically noted that she did "not find the additional limitations suggested by the claimant's representative [additional limitations posed by claimant's representative to the VE] to be supported by the evidence or record or credible in evaluation of the claimant's disability." (R.p. 17). Although the ALJ is required to set out all of Plaintiff's credible impairments

---

[7]The specific testimony cited by Plaintiff is detailed below.

Q [ALJ]. Assume a hypothetical individual with the same vocational factors and impairments as in hypothetical No. 1 except that this individual is limited as stated in claimant's testimony considering all the testimony to be credible, based on this profile would this hypothetical individual be able to perform claimant's past work?

A [VE]. On the basis of her testimony and the limitations described, it would be my opinion she would not be able to perform any of her previous work or any other substantial work in the competitive labor market.

(R.pp. 39-40).



in his hypothetical to the VE, see Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989)[In order for a vocational expert's opinion to be helpful and relevant, it must be "in response to proper hypothetical questions which thoroughly set out all of claimant's impairments"]; Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) [hypothetical question submitted to the VE must state the claimant's impairments with precision], the ALJ is not required to include limitations in his hypothetical that she did not find were shown in the evidence. Lee v. Sullivan, 945 F.2d 687, 692 (4th Cir. 1991)[ALJ not required to include limitations or restrictions in his decision that he finds are not supported by the record]; Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir.2005) [noting that an ALJ is not required to submit to the VE every impairment alleged by a claimant, but instead must "must accurately convey to the [VE] all of a claimant's *credibly established limitations*"].

As previously noted, this Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence. Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]. While Plaintiff points to what she considers to be evidence sufficient to support her claim of disability, she has established no reversible error in the ALJ's treatment and consideration of the medical and opinion evidence cited in her brief. Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]; Kellough, 785 F.2d at 1149 ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]. Therefore, Plaintiff's credibility argument is without merit.



**Conclusion**

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

The parties are referred to the notice page attached hereto.

Bristow Marchant
United States Magistrate Judge

March 15, 2016
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).